**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

JUSTIN JAMES HINZO,

        Plaintiff,

v.                                    CIV 10-506 JB/CG

STATE OF NEW MEXICO
DEPARTMENT OF CORRECTIONS, et al.,

        Defendants.

### PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** is before the Court on Plaintiff's *Prisoner's Civil Rights Complaint*

("Third Amended Complaint"), filed on January 4, 2011, (Doc. 30); *Motion by the Plaintiff*

*Pro Se Requesting Permission to Add One Last Defendant to the Complaint; G.E.O.*

("Supplement to Third Amended Complaint), filed on March 8, 2011, (Doc. 37);

*Defendants' Court Ordered Martinez Report* ("NMCD's *Martinez* Report), filed on July

10, 2012, (Doc. 83); *Defendants Correctional Medical Services, Inc., Dr. Arnold, Dr.*

*Stover, Dr. Debra Clyde, Dr. Mizell, and Lianne Lopez, RN Martinez Report*, filed on

July 10, 2012, (Doc. 84) and *Defendant Corizon, Inc. FKA Correctional Medical*

*Services, Inc., Dr. Arnold, Dr. Stover, Dr. Clyde, Dr. Mizell & Liane Lopez, RN's*

*Supplemental [sic] to Martinez Report*, (collectively, "CMS's *Martinez* Report) filed on

July 31, 2012, (Doc. 97); *Defendant Wexford Health Services, Inc.'s Martinez Report for*

*Plaintiff Justin James Hinzo's Claims and Motion for Summary Judgment* ("Wexford's

*Martinez* Report), filed on July 10, 2012, (Doc. 85); *Plaintiff Pro Se Court Ordered*

*Objection to Defendants New Mexico Department of Corrections Martinez Report*

("Plaintiff's Response to NMCD's *Martinez* Report), filed on September 26, 2012, (Doc.

117); *Plaintiff Pro Se Court Ordered Objections to the Defendants Correctional Medical Services Inc., Dr. Arnold, Dr. Stover, Dr. Mizell, Dr. Clyde, and Lianne Lopez Martinez Report* ("Plaintiff's Response to CMS's *Martinez* Report"), filed on September 26, 2012, (Doc. 118); *Plaintiff Pro Se Court Ordered Objections to the Defendants Wexford Inc.'s Martinez Report and Summary Judgment* ("Plaintiff's Response to Wexford's *Martinez* Report), filed on September 26, 2012, (Doc. 119); *Reply in Support of Defendant NMCD's Martinez Report* ("NMCD's Reply"), filed on October 5, 2012, (Doc. 121); *Reply in Support of Defendant Wexford Inc.'s Martinez Report and Motion for Summary Judgment* ("Wexford's Reply"), filed on October 5, 2012, (Doc. 122); and *Defendants Correctional Medical Services, Inc., Dr. Arnold, Dr. Stover, Dr. Clyde, Dr. Mizell & Liane Lopez, RN's Reply in Support of their Previously Filed Martinez Report* (Doc. 84) ("CMS's Reply"), filed on October 9, 2012, (Doc. 124).

Also before the Court is the *Motion by Plaintiff Pro Se Requesting that the Court Enter Summary Judgement/Default Judgement* [sic] *Against Counsel Mr. Norman Weiss and All Defendants Represented by Mr. Norman Weiss for Failing to Serve the Court Ordered Martinez Report. . .* ("Plaintiff's Motion for Summary Judgment"), filed on August 17, 2012, (Doc. 110), and *CMS Defendants' Response to Plaintiff's Motion for Summary Judgment/Default Judgment* (Doc. 110), filed on August 27, 2012, (Doc. 112).

## I.   Background

In his Third Amended Complaint and Supplement to Third Amended Complaint, Plaintiff states that Defendants, in their official capacities, have been deliberately indifferent to his safety and medical needs in violation of the Eighth Amendment; he explains that he is also bringing his claims under the New Mexico Tort Claims Act

("N.M.T.C.A.").  (Doc. 30 at 1-4; Doc. 37 at 1).  Plaintiff's Third Amended Complaint contains a lengthy account of the facts he believes support his claims.  Plaintiff seeks damages and equitable relief.

### a. Procedural Background

Plaintiff filed his original complaint in state court on December 31, 2009, and Defendants removed the case to this Court on May 26, 2010.  (Doc. 1; Doc. 1-1).  On December 14, 2010, the Honorable United States District Judge James O. Browning ordered Plaintiff to submit a third amended complaint with specific, precise allegations, including the time frame for which he was suing.  (Doc. 29 at 1-4).  The Third Amended Complaint names eighteen Defendants and describes, in great detail, the events that form the basis of Plaintiff's claims.  (Doc. 30).  In a subsequent order, the Court allowed Plaintiff to join G.E.O. as an additional Defendant, though it appears that this Defendant was not served and, therefore, has not filed a *Martinez* Report.  (Doc. 48 at 1-2).

Plaintiff's Third Amended Complaint states that he is bringing claims under § 1983 for violations of his Eighth Amendment rights and under the N.M.T.C.A. for Defendants' failure to protect his safety and for denying him adequate medical care. (Doc. 30 & 37).  In his Memorandum Opinion and Order dated February 22, 2012, Judge James O. Browning addressed several of Plaintiff's claims. (Doc. 59).  Judge Browning dismissed Plaintiff's § 1983 claims against the New Mexico Department of Corrections, Joe Williams, George Tapia, Jerry Roark, Wayne Gallegos, and Lawrence Jaramillo. (*Id.* at 12, 16, 20-25).  He also dismissed Plaintiffs § 1983 claims related to his slip and fall in 2010.  (*Id.* at 22).  Finally, he directed Plaintiff to provide the full

names and addresses of several unidentified or unserved defendants in order to effect service of the complaint and summons. (*Id.*).

The claims that remain following Judge Browning's Memorandum and Order are as follows: Plaintiff claims that Defendant G.E.O. violated his Eighth Amendment right to safe conditions of confinement by operating a facility that lacked ladders to the top bunk beds; that Defendants Wexford, Inc., CMS, and their employees violated his Eighth Amendment rights by failing to provide adequate medical care  for his back pain; and that Defendants CMS and David Gonzales violated his Eighth Amendment right to safe conditions of confinement by having him discharged from the hospital earlier than medically recommended and in transporting him back to the prison in an unsafe manner.  Plaintiff's claims under the N.M.T.C.A. against all Defendants have not been dismissed by any previous order.

In addition to dismissing several claims, Judge Browning raised the possibility that several of Plaintiff's claims might be time barred.  (*Id.* at 13-15). Specifically, he found that any conduct prior to December 31, 2006, was potentially barred by the statute of limitations since it would have occurred more than three years prior to filing suit. (*Id.*). Plaintiff alleged that the statute of limitations should be tolled for those claims. (Doc. 49 at 1-2). Judge Browning ordered Plaintiff to provide evidence to support his tolling argument. (Doc. 59 at 13-15).

Following Judge Browning's order to produce all injury-related grievances from 2004 through December 31, 2006, as well as the names and addresses of all unidentified or unserved Defendants, Plaintiff began sending out requests for information to both opposing counsel and various Corrections Department personnel.

(*See, e.g.*, Doc. 62; Doc. 69 at 6-18). Some of his requests for production were answered and he discovered the name of the correctional officer who drove the van on April 30, 2009, following Plaintiff's operation - David Gonzales. (Doc. 69 at 3). This Defendant was served and is represented by counsel in this case. However, most of Plaintiff's requests for production were denied for failure to comply with the federal rules regarding discovery requests. (*See*, *e.g.*, Doc. 71; Doc. 73; Doc. 77). In order to deal with Plaintiff's Third Amended Complaint in its entirety and as efficiently as possible, the Court ordered a *Martinez* Report. (Doc. 79).

Defendants filed their *Martinez* Reports in July 2012, and asked the Court to construe their *Martinez* Reports as Motions for Summary Judgment. (Doc. 83 at 1; Doc. 82 at 112; Doc. 85 at 1). On August 17, 2012, Plaintiff's Motion for Summary Judgment was filed on the docket; Plaintiff asked the Court to grant Plaintiff summary judgment or enter a default judgment against Defendants represented by Counsel Norman Weiss because Plaintiff had not received CMS's *Martinez* Report. (Doc. 110 at 1-3). Plaintiff's Motion for Summary Judgment was dated August 13, 2012. (Doc. 110 at 3). Before the entry of Plaintiff's Motion for Summary Judgment on the docket, the Court, on August 15, 2012, ordered Defendant to serve Plaintiff with a second copy of the *Martinez* Report and allowed him thirty days from receipt to file a response thereto. (Doc. 108 at 5-6). On August 22, 2012, Plaintiff filed a notice indicating that he had received CMS's *Martinez* Report on August 15, 2012. (Doc. 111).

Plaintiff has responded to each of the three *Martinez* Reports separately, and Replies in Support of the *Martinez* Report were also filed. Plaintiff's Third Amended

Complaint, Defendants' *Martinez* Reports, and the parties' Responses and Replies form the basis of the factual background and analysis that follows.

### b. Factual Background

#### i. Plaintiff's Claims

Plaintiff's first claim is that Defendants failed to provide a safe environment while he was incarcerated; he recites several incidents that he believes violated his Eighth Amendment rights and create a cause of action for negligence under the N.M.T.C.A. (Doc. 30 at 6).  Plaintiff's second claim is that Defendants violated his Eighth Amendment rights "by failing to provide proper and adequate medical care, deliberate indifference;" he again states that Defendants were negligent under the N.M.T.C.A. by failing to provide proper medical care.  (*Id.* at 13).  Using Plaintiff's Third Amended Complaint, his Supplement to his Third Amended Complaint, and Plaintiff's Responses to the various *Martinez* Reports, the Court summarizes the supporting facts for Plaintiff's claims below.

In 2004, Plaintiff was incarcerated at the Lea County Correctional Facility ("LCCF"), built and operated by G.E.O.  (Doc. 30 at 6; Doc. 37 at 1).  He claims that he suffered a back injury when he fell while trying to climb down from the top bunk in his cell at some point in 2004; he specifically attributes the fall to the lack of stairs or a ladder that would make the top bunk bed more accessible.  (*Doc. 30 at 6;* Doc. 37 at 2).  Plaintiff claims that he sought medical treatment for his injury but a doctor, John Doe at LCCF, ignored Plaintiff's complaints of severe pain and prescribed a mild painkiller.  (*Doc. 30* at 13). After several months of complaining about the pain, Dr. John Doe sent Plaintiff for an x-ray in August 2005. (*Id.*). When the x-ray did not show a significant

injury, Dr. John Doe accused Plaintiff of lying about his pain and wrote in Plaintiff's file

that he was attempting to get high on pain medication. (*Id.*). Plaintiff filed grievances

against Dr. Doe but they were denied. (*Id.*).

Plaintiff was transferred to the Central New Mexico Correctional Facility

("CNMCF") in the summer of 2005. (*Id.* at 13-14). Allegedly because of the note about

the potential abuse of pain medication, CNMCF doctors continued to ignore his claims

of severe pain and requests for treatment. (*Id.* at 14). In the summer of 2006, Plaintiff

was sent for a CT scan which revealed that Plaintiff had suffered a herniated disc at the

L5-S1 level in his spine, the bulging disc was pressing on his sciatic nerve, and Plaintiff

had degenerative disc disease.  (*Id.*). Plaintiff claims that Dr. Harvie recommended an

MRI to get a better image of Plaintiff's spine and also recommended a fusion surgery.

(*Id.*).

Shortly thereafter Plaintiff was transferred to the Western New Mexico

Correctional Facility ("WNMCF"). (*Id.*). Plaintiff advised the medical staff of Dr. Harvie's

recommendation and of his continuing pain but the doctors refused to prescribe any

stronger painkillers than what had initially been prescribed at LCCF. (*Id.*). Plaintiff

received an MRI in late 2006 which, according to Plaintiff, confirmed the need for back

fusion surgery. (*Id.*). Plaintiff alleges that Wexford Medical Services, which provided

medical care for the facilities in which Plaintiff was incarcerated, refused to pay for the

surgery due to its cost even though it was recommended by Dr. Harvie. (*Id.* at 15; Doc.

119 at 6-7). Instead Plaintiff continued receiving pain medication and treatment at a pain

clinic.  (Doc. 30 at 15). In addition, doctors at CNMCF, the Penitentiary of New Mexico

("PNM") and Southern New Mexico Correctional Facility ("SNMCF") continued to ignore

his complaints of severe pain and refused to provide adequate pain medication. (*Id.* at 15-16).

In late 2007, Plaintiff was transferred to CNMCF to receive ten to fifteen traction sessions, a recommended treatment that was ultimately ineffective in alleviating Plaintiff's pain. (Doc. 30 at 16). In January 2008, Plaintiff was sent for another MRI, provided a TENS unit, a prescription for MS Contin, and a second mattress to help with the back pain. (Doc. 30 at 17). The doctors at PNM sent Plaintiff to a neurosurgeon, Dr. Hankinson, who stated that he could perform surgery; the doctors at PNM began pressuring Defendant Correctional Medical Services, which had succeeded Wexford as the provider of medical care to inmates, to pay for the fusion surgery. (*Id.*). The surgery was performed in April 2009. (*Id.* at 17).

Plaintiff was transported back from the hospital only a day and a half after the surgery, allegedly against a doctor's recommendation. (*Id.*). Plaintiff was transported sitting up and fully shackled, allegedly contrary to the floor doctor's recommendation that Plaintiff be transported by ambulance or lying down. (*Id*). Plaintiff alleges that the driver, Corrections Officer David Gonzales, drove at a high rate of speed and veered off the road several times, resulting in a second back injury. (*Id.* at 17-18). Plaintiff states that immediately upon arrival at the Long Term Care Unit ("LTCU"), he informed the staff of the injury he received in the van, and informed Dr. Hankinson of the injury on May 12, 2009. (Doc. 30 at 18; Doc. 117 at 12). Plaintiff alleges that the doctors ignored his claims of severe pain and did not check to see whether he had suffered a second spinal injury during the transport until August of 2009, when Plaintiff received another MRI. (Doc. 30 at 18). The MRI revealed a new bulge in the L5-S1 disc. (*Id.* at 19).

Based on those results, Plaintiff claims that Dr. Hankinson recommended a second fusion surgery or a higher dose of pain medication. (*Id.*). Plaintiff claims that in December 2009, doctors at PNM began to decrease Plaintiff's dosage of pain medication with no medical justification. (*Id.* at 19-20).

In January 2010, Plaintiff slipped and fell on icy stairs.  (*Id.* at 19).  He alleges that this aggravated his back pain, but that the medical staff did not adequately treat his pain.  (*Id.* at 19).  He filed a grievance related to this incident, but nothing came of it. (*Id.* at 19).

Doctor Clyde then discontinued Plaintiff's pain prescription entirely, forcing him to suffer through severe withdrawal, but he also states that he was prescribed a low dose of methadone. (*Id.* at 20-21). Plaintiff claims that Dr. Clyde also took away his second mattress and withheld his TENS unit for a month.  (*Id.* at 20).  Plaintiff further claims that Dr. Clyde instructed the staff not see or treat Plaintiff. (*Id.* at 20).  Repeated grievances and complaints have been routinely denied and Plaintiff continues to experience severe pain. (*Id.*). Plaintiff alleges that Liane Lopez, when asked about Plaintiff's grievances, knew that if she told the grievance officer that Plaintiff was being treated properly no one would follow up on the actual care Plaintiff was receiving; Plaintiff implies that Ms. Lopez was aware that Plaintiff was not receiving adequate medical treatment.  (*Id.* at 20). He alleges that, as a result of the Defendants' deliberate indifference to his medical needs since 2004, his injuries have become permanent and irreparable. (*See, e.g.*, *Id.* at 8, 22-23).

Plaintiff filed lengthy responses to Defendants' *Martinez* Reports.  (Docs. 117, 118, 119).  In these filings, Plaintiff maintains that he did not receive adequate medical

care and the treatment he did receive was often delayed; alleges that Defendants' have altered the grievances he filed; and speculates as to why certain medical providers would or would not have written what they did in his medical records. (*See*, *generally*, Docs. 117, 118, 119).  Additionally, Plaintiff argues that when he was seen by medical providers or physical therapists, the appointments were curtailed, or at times did not actually occur.  (Doc. 118 at 8, 14; *see*, *generally*, Docs. 117, 118, 119).  Finally, Plaintiff acknowledges that he received pain medications and muscle relaxants from 2005 to 2008, but claims that because the medications were typically "mild" and, occasionally, Vicodin, the treatment was not appropriate for his injury.  (Doc. 118 at 3-5; Doc. 119 at 2).

Plaintiff asserts that the statute of limitations on his claims should be tolled because he was actively seeking medical treatment, yet receiving different diagnoses and treatments.  (Doc. 119 at 10).  Moreover, he argues that he was prevented from consulting with attorneys regarding his claims due to his incarceration, specifically his placement in segregation, and his own lack of knowledge about the law prevented him from filing a claim on his own.  (*Id*. at 10).

### ii.  Defendants' Martinez Reports

#### 1.  Plaintiff's Medical Records

In response to the Court's Order for *Martinez* Report, (Doc. 79), Defendants' CMS,[1] Wexford, and NMDC each filed a responsive *Martinez* Report.  (Docs. 83, 84, 85).  Combined, these *Martinez* Reports contain several thousand pages consisting of

---

[1] Due to its volume, CMS's *Martinez* Report was not electronically filed.  It contains Plaintiff's prison medical records during periods of incarceration from 1994 - 2012, the affidavit of Patrick H. Arnold, MD, CCHP, the Professional Services Contract between the State of New Mexico Corrections Department and Correctional Medical Services, and Plaintiff's Grievance File No. S-09-12-07. The medical records have been Bates Stamped HINZO 00001 – HINZO 01897.  When referring to these medical records, the Court will use the Bates stamped number.

Plaintiff's prison medical records from 1994-2012, Plaintiff's prison grievances related to his medical issues, and affidavits.  The three *Martinez* Reports significantly overlap each other, with each Defendant providing some of the same medical records and grievances.  Defendants asked the Court to construe their *Martinez* Reports as Motions for Summary Judgment, asserting, variously, that Plaintiff's claims are barred by the applicable statute of limitations; that Plaintiff has failed to exhaust his administrative remedies; Defendants are entitled to Qualified Immunity; and that Defendants did not violate Plaintiff's constitutional rights.  (*See* Docs. 83, 84, 85).  Defendant Wexford provided care from April 2005 through June 29, 2007 and Defendant CMS provided medical care from June 30, 2007 through the present.  (Doc. 84 at 2; Doc. 85 at 2).  The Court will summarize the relevant parts of Plaintiff's medical records and grievances, as provided by Defendants, in order to provide a factual background for its analysis of Plaintiff's claims below.

On August 2, 2004, Plaintiff asked to see a doctor, staying that his shoulder "hurts realy [sic] bad.  As well as my back.  Was in bad motorcycle accident awhile back.  Messed up lower back and dislocated shoulder."  (HINZO 00496).  On September 9, 2004, Plaintiff was seen by a medical provider who noted that he complained of lower back pain, again mentioning an accident.  (HINZO 00434).  The provider apparently recommended that Plaintiff avoid participation in recreation for a month and prescribed Ibuprofen for a month.  (HINZO 00434; HINZO 00471).

Starting in April 2005, and through November 2005, Plaintiff sent twenty-nine medical requests regarding his back pain.  (HINZO 00626 – 00654).  A Health Services Receipt indicates that Plaintiff was provided a back brace on May 5, 2005.  (HINZO

00658).  In 2005, Plaintiff was seen by a medical provider for his back pain twice in April, May, June, October, and once in both September and November.  (HINZO 00517-00525).  An x-ray in June revealed that there was no acute compression of the vertebra but that the interspaces were narrowed by 50 – 75 percent.  (HINZO 00557).  In addition to being instructed on physical exercises to help his back, Plaintiff was prescribed, at various times from April through December 2005, Acetaminophen, Ibuprofen, Naprosyn, analgesic balm, Baclofen, Vicodin, and Ultram/Tramadol.[2]  (HINZO 00522; 00581-00604).

Plaintiff sent health service request forms regarding his back in February, August, September, October, November, and December of 2006.  (HINZO 00779-00808).  Several of these relate to a concern about renewing his pain medications in time, or not receiving his prescribed medication.  On September 20, 2006, Plaintiff notes that his back felt better when he was taking Baclofen.  (HINZO 00792).  In another note, Plaintiff stated that he had been approved for back surgery before his transfer to WNMCF.  (HINZO 00799).  Plaintiff was seen by a medical provider, as reflected in Interdisciplinary Progress Notes, for his back in April, June, September, and November of 2006.  (HINZO 00674-00682).

A CT scan was done in June 2006; the results showed moderate spinal stenosis at L3-4, mild spinal stenosis at L4-5, and a herniated disc at L5-S1 to the left.  (HINZO 00676; Doc. 87 at 48-49).  Based on these results, the medical provider at CNMCF increased Plaintiff's Ultram and Flexeril, prescribed Baclofen, recommended Plaintiff do pelvic tilts daily, and planned a collegial review for a consultation with a spine specialist.

---

[2] Acetaminophen, Ibuprofen, and Naprosyn are non-narcotic pain medications; Baclofen is a muscle relaxant; Ultram/Tramadol is a narcotic like pain medication; Vicodin is Acetaminophen with codeine and is a mixed non-narcotic/narcotic agent.  (Doc. 84-1 at 3-8).

(HINZO 00676).  On September 15, 2006, Plaintiff had an orthopedic consultation with Dr. Keith Harvie.  (Doc. 87 at 48-49).  Dr. Harvie had reviewed Plaintiff's history and CT scan.  (Id.)  His assessment and plan was to have an MRI of Plaintiff's lumbar spine and then have Plaintiff return to the office.  (Id.)  Dr. Harvie also wrote that a selective nerve block may help determine the areas causing or affected by the pain.  (Id.).  Plaintiff was transferred to WNMCF in October 2006; his herniated disc and back pain were noted on his receiving screen form.  (HINZO 00668).  An MRI was done on October 23, 2006; it showed a very large herniated disc to the left at L5-S1.  (Doc. 88 at 9).  Dr. Donna Deming, the Medical Director of WNMCF, wrote in Plaintiff's prison medical records that she spoke with Dr. Harvie about the MRI results; her notes indicate that Dr. Harvie requested a selective nerve block and apparently said that if the pain was relieved, there was a 90% chance that surgery would relieve Plaintiff's pain.  (HINZO 00681).  Notes regarding the collegial review, recorded on December 14, 2006, indicate that a decision to send Plaintiff to the pain clinic was made and that surgery was not indicated.  (HINZO 00687).

From January 1, 2007 through December 31, 2007, Plaintiff put in over forty health service requests.  (HINZO 00957 – 01002).  Several of these involved complaints about back pain, the ineffectiveness of his medication, or delays in renewing prescriptions or receiving treatment.  (Id.).  On December 31, 2007, Plaintiff requested a return to previous medications, Baclofen and Tramadol, as they "gave [him] significant relief from pain and misery."  (HINZO 01002).

In February 2007, Plaintiff had a consultation with Dr. Steven Sloan, who recommended lumbar epidural injections at L5-S1 and to start Neurontin, continuing

with Ultram and baclofen.  (HINZO 01760-01761).  He also suggested that once

Plaintiff's pain is under control, he should undergo physical therapy, specifically lumbar

traction.  (Id.).  Finally, Dr. Sloan stated that if the epidural steroid injections and

medication management did not provide significant relief, surgical decompression was a

possibility.  (Id.).  Although the treatment was initially denied in April in favor of an

increase in Gabopentin,[3] the treatment was requested again in July and Plaintiff

ultimately received lumbar epidural steroid injections on July 26, 2007 and September

12, 2007.  (HINZO 00839-00844; 01767-01769).

Several Interdisciplinary Progress Notes indicate that Plaintiff was receiving

physical therapy in the summer of 2007.  (HINZO 00841; 00844; 00847).  In August

2007, a transfer to CNMCF was contemplated so that Plaintiff could receive his

Hepatitis treatment and traction.  (HINZO 00845).  At some point during the fall of 2007,

he was transferred and did receive traction.  (HINZO 00878).  He also received a

lumbar belt and was using it "with some relief."  (HINZO 00856).  Over the course of

2007, Plaintiff received the following pain medications: Acetaminophen, Tramadol,

Baclofen, Gabapentin, Cyclobenzaprine, Amitriptyline, and Meloxicam.[4]  (Doc. 84-1 at

3-4).

In 2008, Plaintiff submitted almost forty health service requests.  (HINZO 01170-

01207).  Many of these were requests to see a provider, change his medication, alert

the medical staff that he had not received his medication, and to reiterate his complaints

of back pain.  (Id.).  In one request, Plaintiff requests to receive previously prescribed

medications as he had "a good combination of meds that relieved the pain and allowed

---

[3] Gabapentin is a neuropathic pain adjunct.  (Doc. 84-1 at 3)
[4] Cyclobenzaprine is a muscle relaxant; Amitriptyline is a neuropathic adjunct; and Meloxicam is a non-narcotic pain medication.  (Doc. 84-1 at 3-4)

me to deal with my injury a lot better." (HINZO 01188). In 2008, Plaintiff was seen by a prison medical provider twenty-eight times for non-psychiatric reasons. (HINZO 1002-1054). He was prescribed, over the course of the year, Meloxicam, Baclofen, Ibuprofen, Talwin, Naprosyn, Acetaminophen, Tramadol, and MS Contin.[5] (Doc. 84-1 at 4-5). Plaintiff was also provided a back brace, two mattresses, and a TENS unit to help with his back pain. (HINZO 01209, 01214, 01217).

In April 2008, Plaintiff again saw Dr. Michael Malizzo, who provided Plaintiff with the lumbar epidural spine injections in 2007. (HINZO 01770). In his summary of Plaintiff's history, Dr. Malizzo wrote that Plaintiff "has seen Dr. Harvie who recommended what sounds like a decompression and fusion surgery for this. The patient wanted to try conservative care prior to that. He has now had the conservative care and has failed." (*Id.*). Dr. Malizzo recommended that Plaintiff be reevaluated by a neurosurgeon and receive another MRI. (*Id.*).

Plaintiff received an MRI in June 2008; the MRI findings were

compatible with bulky disc herniation at L5-S1 extending to the left with left formainal narrowing and nerve root compression . . . central disc bulge with posterior bony degenerative change resulting in moderate central stenosis at L4-L5 . . . posterior bony degenerative changes with moderate stenosis at L3-L4 . . . additional mild degenerative findings.

(HINZO 01771).

Plaintiff saw neurosurgeon Dr. Hal Hankinson in August, November, and December of 2008. (HINZO 01775-01778). Dr. Hankinson reported in November that a discectomy and fusion at L5-S1 was available but that he had told Plaintiff that he was not "entirely optimistic that one would be effective," but that if Plaintiff decided "an operation would be appropriate, one is available." (HINZO 01775). On December 9,

---

[5] Talwin is a mixed narcotic pain medication; MS Contin is a narcotic pain medication. (Doc. 83-4 at 5).

2008, Plaintiff informed a prison medical provider that he was "ready" to have the surgery. (HINZO 01207). Plaintiff met with Dr. Hankinson on December 30, 2008; Dr. Hankinson's report indicates that Plaintiff wished to have his back pain "treated definitively" and an operation would be planned "as soon as can be arranged." (HINZO 01778).

Plaintiff was scheduled to receive an L5-S1 laminectomy and discectomy on February 10, 2009 but the surgery was cancelled because Plaintiff ate or drank the day before (he claims that he was not told to abstain from eating or drinking). (HINZO 01235; Doc. 84 at 41). He was also informed that he could not stay on morphine long term. (HINZO 01235). Plaintiff received a left L5-S1 laminectomy and discectomy on April 28, 2009, performed by Dr. Hankinson. (HINZO 01789-01790). Dr. Hankinson discharged Plaintiff to the LTCU at Los Lunas Penitentiary on April 30, 2009. (HINZO 01794). The discharge instructions included lifting restrictions, incision care, a note to schedule a follow-up appointment with Dr. Hankinson in three weeks, a restriction on physical therapy until after the follow-up appointment, and directed that Plaintiff's pain was to be controlled as per Dr. Mizell at the penitentiary. (*Id.*). The discharge instructions also note that Plaintiff was discharged to Los Lunas Prison Facility and the mode of transportation was specifically written in the form as "van" near the preprinted checkboxes for "Wheelchair," "Ambulatory," and "Stretcher." (HINZO 01795).

On May 10, 2009, while still in the LTCU, Plaintiff submitted a health services request complaining about the administration of his pain medication. (HINZO 01288). He had a follow-up appointment with Dr. Hankinson May 12, 2009; Dr. Hankinson reported that Plaintiff still had post-operative back and leg pain. (HINZO 01779). He

also noted that Plaintiff should be stretching and should start additional physical therapy in mid-June.  (*Id.*).  Dr. Hankinson recommended that Plaintiff's medication, MS Contin, be tapered "fairly slowly" and that the ultimate prognosis was "fairly good but most likely not perfect."  (*Id.*).

On May 18, 2009, Plaintiff complained of back pain, writing that his back hurts as much as it had prior to his surgery and that it still hurt in the same place.  (HINZO 01289).  Through the rest of 2009, Plaintiff submitted several more requests, explaining that his pain was continuing and his medications were not effective.  (HINZO 01290-01300).  In August 2009, Plaintiff had another MRI.  (HINZO 01797-01799).  On September 9, 2009, Plaintiff was advised that Dr. Stover did not plan to increase his medication, but that he was seeking a neurosurgery consultation.  (HINZO 01252).  Plaintiff was also seen by a physical therapist in July, August, September, October, November, and December of 2009.  (HINZO 01250-51, 01254).

On September 30, 2009, Plaintiff saw Dr. Hankinson.  (HINZO 01780).  Dr. Hankinson reviewed the results of the August MRI and discussed an operation with Plaintiff, although it was unclear whether a fusion would help.  (*Id.*).  Dr. Hankinson also suggested that raising Plaintiff's dose of MS Contin would be appropriate.  (*Id.*).

Plaintiff's MS Contin was increased on October 14, 2009 and he agreed to two to three months of physical therapy, after which another surgery could be discussed.  (HINZO 01253).  In 2009, Plaintiff was prescribed MS Contin, Vicodin, Acetaminophen, Baclofen, Ibuprofen, and Prednisone.  (HINZO 01328-01389; Doc. 84-1 at 6).  In December, Plaintiff was informed that he would be tapered off of his narcotic medications.  (HINZO 01256).

In 2010, Plaintiff was seen by a prison medical provider in January, February, March, April, July, and September, for a total of at least twelve times (this number excludes visits with psychiatric providers).  (HINZO 01415-01433).  He also saw a physical therapist once a month from January through May.  (HINZO 01416, 01422).  Plaintiff had an x-ray on January 21, 2010; it showed a normal lumbar spine.  (HINZO 01442).  Additionally, Plaintiff's medications were renewed or adjusted at least once a month throughout the year.  (HINZO 01443-01455, 01456-01514).  Over the course of 2010, Plaintiff was prescribed morphine, MS Contin, Ibuprofen, Methadone,[6] and Baclofen.  (HINZO 01456-01514).

In April 2010, Dr. Stover asked for a consultation regarding a laminectomy and fusion.  (HINZO 01539).  However, this request was denied in favor of an alternate treatment plan.  (HINZO 01540).  The recommendation suggested changing the medication dose in the absence of new exam findings.  (*Id.*).

Plaintiff complained several times about his back pain and prescriptions.  (HINZO 01542-01563).  In July 2010, Dr. Debra Clyde explained in a memorandum to Plaintiff that his exact dosage of methadone was smaller than his previous dose of morphine because Methadone is a more potent medication.  (HINZO 01516).  Also in July, Plaintiff met with Dr. Clyde about his complaints of treatment for his back pain and medications; she explained that his statements regarding his pain and medications are "inconsistent internally."  (HINZO 01427).  In September, after a physical examination, Dr. Clyde increased Plaintiff's methadone dose.  (HINZO 01432).  On October 5, 2010, Dr. Clyde requested nerve conduction studies.  (HINZO 01541).

---

[6] Methadone is a narcotic pain medication.  (Doc. 84-1 at 7).

In 2011, Plaintiff was seen by a non-psychiatric prison medical provider in February, March, April, June, July, August, September, and October for a total of seventeen visits.  (HINZO 01572-01579).  His pain medications were renewed or adjusted at least once every month.  (HINZO 01601-01613, 01614-01670, 01805-01810).  Throughout 2011, Plaintiff was prescribed Parafon Forte, Ibuprofen, Methadone, Pamelor, and Baclofen.[7]  (HINZO 01614-01670).

In February, Dr. William Shannon requested a follow up appointment for Plaintiff with Dr. Hankinson.  (HINZO 01700).  This request was denied and an MRI was suggested instead; if the MRI showed any changes, then Plaintiff could be sent back to the neurosurgeon.  (HINZO 01701).  The MRI was requested on February 28, 2011; Plaintiff had the MRI on March 15, 2011 and a follow-up appointment with Dr. Hankinson on April 13, 2011.  (HINZO 01702, 01781).  Dr. Hankinson reported that "an operation was available, which could include a fusion, but there is no assurance that that would relieve his pain."  (HINZO 01781).  Dr. Hankinson listed other options, including facet or epidural injections, or muscle relaxants.  (HINZO 01781-82).  Dr. Shannon also requested "physical therapy/myofacial pain evacuation" in June, but Dr. Arnold suggested an alternative treatment plan.  (HINZO 01705).  Dr. Arnold suggested non-narcotic analgesia and Pamelor for control if patient is not an operative candidate.  (*Id.*).

In September 2011, Plaintiff was also referred to Dr. Michael Baten for nerve conduction studies.  (HINZO 01707, 01772).  Dr. Baten reviewed Plaintiff's March 2011 MRI and reported that it showed a "right paracentral abnormality at L4-5, probably a disc protrusion."  (HINZO 01772).  He further stated that Plaintiff "has a basically normal

---

[7] Parafen Forte is a muscle relaxant; Pamelor is a neuropathic adjunct agent.  (Doc. 84-1 at 8).

exam but has persistent pain.  He certainly has findings on the MRI which [, . . . while] not severe certainly could be producing some of the patient's problems."  (*Id.*). Although Plaintiff was sent to Dr. Baten for electrodiagnostics, Dr. Baten opined that that kind of testing would not lead to a clear indication of the next steps, particularly regarding an operation.  (*Id.*).  Dr. Baten recommended selective nerve root injections or an epidural steroid.  (*Id.*).

In October and November of 2011, Dr. Shannon referred Plaintiff for chronic pain management.  (HINZO 01709-01712).  Plaintiff saw Dr. James Rice of the Southwest Interventional Pain Specialists, in February, April, and May of 2012.  (HINZO 01894-01897).  Plaintiff received epidural steroid injections at each of these visits. (HINZO 01824; 01894-01897).  At the April and May visits, Dr. Rice varied the exact form of injection in an attempt to find more effective relief for Plaintiff's pain as the injections were not effective for more than a few days.  (HINZO 01895-01897).

Plaintiff saw a non-psychiatric prison medical provider in January, February, March, May, and June of 2012 (medical records beyond June 2012 have not been submitted).  (HINZO 01823-01830).  He was provided with an extra mattress in January 2012.  (HINZO 01886).  He received Methadone, Pamelor, Ibuprofen, and Parafon Forte/Chloroxazone in 2012.  (HINZO 01849-01867).  Plaintiff also had an MRI on June 27, 2012.  (HINZO 01892).

## 2.  Plaintiff's Grievances

In its *Martinez* Report, Defendant NMCD included grievances filed by Plaintiff that relate to his back pain and medical care from January 1, 2004 through July 2, 2012. (Doc. 83-14 at 2).  The nine grievances filed as part of this *Martinez* Report include the

grievances filed by CMS and Wexford as part of their *Martinez* Reports.  (Doc. 83-14 at 3-4; Doc. 84-1 at 81-90; Doc. 87 at 11-12 and 14-21; Doc. 88 at 41-45).  In an affidavit, NMCD Grievance Coordinator, Ralph Casaus, states that these are the only grievances that Plaintiff filed that contain information relevant to the claims and allegations raised by Plaintiff in his complaint.  (Doc. 83-14 at 1-4).

Plaintiff submitted nine grievances that were considered "medical."  (Doc. 83-14 at 2-4; Doc. 83-22 at 1-2).  Of these nine grievances, three were submitted before December 31, 2006.  (Doc. 83-22 at 1-2).  Grievance No. 05-04-60 was submitted to NCMD on April 28, 2005 but was not fully appealed.  (Doc. 84-14 at 3).  Grievance No. 06-471 was submitted on December 6, 2006 but was also not fully appealed.  (Doc. 83-14 at 3).  On June 25, 2005, Plaintiff filed an informal complaint regarding treatment of his back injury related to his fall from a bunk bed at LCCF.  (Doc. 83-21 at 4).  This informal complaint became Grievance No. 05-7-13 and was fully appealed, with a decision from Erma Sedillo, Deputy Secretary of Operations, signed on August 26, 2005.  (Doc. 83-21 at 1).

Plaintiff's other seven grievances are all related to his claims of a lack of treatment for his back injury, or inappropriate treatment for his back injury.  (*See*, *generally*, Doc. 83, Exhibits 15-21).  In these seven grievances, he did exhaust his administrative remedies by appealing his grievance to the highest level possible.  (Doc. 83 at 18-20).  In Grievance No. S-09-12-07, Plaintiff complained that his pain medication was discontinued without explanation.  (Doc. 83-18 at 1).  This grievance was referred to Defendant Lopez, who submitted a memorandum explaining that Plaintiff was receiving appropriate treatment.  (*Id.* at 2-3).  In one grievance filed in

2009, Plaintiff mentions that "something happened while being transported to L.T.C.U.,"
after his surgery in April 2009, but he does not mention anything about the officer
transporting him.  (*Id.* at 8).  In another grievance filed in 2009, Plaintiff states that he
informed the doctors at LTCU that something was wrong following his surgery, but he
does not elaborate.  (Doc. 83-19 at 1).

## II.    Standard of Review for Summary Judgment

The court shall grant summary judgment only if "the movant shows that there is
no genuine dispute as to any material fact and that the movant is entitled to judgment as
a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of
the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S.
242, 248 (1986). An issue is genuine if the evidence is such that a reasonable jury could
resolve the issue in favor of the nonmoving party. *Id.*  The movant bears the burden of
making a prima facie demonstration that there is no genuine issue of material fact. *Adler
v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670–71 (10th Cir.1998) (citing *Celotex Corp. v.
Catrett,* 477 U.S. 317, 323 (1986)).

If the moving party has demonstrated an absence of an issue of material fact, the
"nonmoving party must come forward with specific facts showing that there is a genuine
issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574,
587(1986) (internal quotations omitted). The mere existence of some evidence in
support of the nonmoving party, however, will not be sufficient for denial of a motion for
summary judgment; there must be enough evidence to enable a jury reasonably to find
for the nonmoving party on that issue. *See Anderson,* 477 U.S. at 249.  The nonmovant
must go beyond the allegations and denials of his pleadings and provide admissible

evidence, which the Court views in the light most favorable to him. *Panis v. Mission Hills Bank, N.A.,* 60 F.3d 1486, 1490 (10th Cir.1995).

The purpose of a *Martinez* Report is to "develop a record sufficient to ascertain whether there are any factual or legal bases for the prisoner's claims." *Hall v. Bellmon,* 935 F.2d 1106, 1109 (10th Cir. 1991). "On summary judgment, a *Martinez* report is treated like an affidavit, and the court is not authorized to accept its fact findings if the prisoner has presented conflicting evidence." *Northington v. Jackson,* 973 F.2d 1518, 1521 (10th Cir.1992). A plaintiff's complaint may also be treated as an affidavit if it alleges facts based on the plaintiff's personal knowledge and is sworn under penalty of perjury. *Hall*, 935 F.2d at 1111.

The Court is mindful that it must construe the filings of a *pro se* litigant liberally. *See id. at* 1110. However, the Court should not be a *pro se* litigant's advocate. *Id.* In addition, Plaintiff, as a *pro se* litigant, must follow the same procedural rules that govern other litigants. *Nielson v. Price,* 17 F.3d 1276, 1277 (10th Cir.1994).

### III. Analysis

#### a. Law Relating to 42 U.S.C. §1983

A civil rights action under § 1983 may be brought against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State…, subjects, or causes to be subjected, any citizen of the United States. . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983 (1996). To state a claim under § 1983, an injured person must allege a violation of a federally protected right, and must show that the alleged deprivation was committed by an individual acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

In order to prevail in an action against an individual in his official capacity, a plaintiff must show that the official acted pursuant to his employer's custom or policy in depriving the plaintiff of his federal right.  *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

### b.  Law Relating to the Eighth Amendment

The Eighth Amendment is implicated when a prison official is deliberately indifferent to a substantial risk of serious harm.  *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).  A prison official violates the Eighth Amendment when (1) objectively, the deprivation alleged is sufficiently serious; and (2) the official has "a sufficiently culpable state of mind."  *Farmer*, 511 U.S. at 834 (internal quotations omitted).

In determining whether conditions of confinement violate the Eighth Amendment and therefore satisfy the objective element that the alleged deprivation is sufficiently serious, the Court is required to consider "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk."  *Helling v. McKinney*, 509 U.S. 25, 36 (1993) (emphasis in original).  "A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (citations omitted).

To prevail on the subjective component, a plaintiff must show "that the defendants knew he faced a substantial risk of harm and disregarded that risk . . . the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Martinez*

*v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009) (internal citations omitted). Mere negligence by prison officials or medical staff will not suffice to meet the subjective prong of deliberate indifference.  *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976); *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980).  Moreover, a "prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation." *Perkins v. Kansas Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir.1999). A prisoner cannot show deliberate indifference by arguing that prison doctors were pursuing a course of treatment which the Plaintiff felt was ineffective or even negligent. *See, e.g.*, *Taylor v. Ortiz*, 410 Fed. App'x 76 (10th Cir. 2010) (no constitutional violation when doctors chose not to provide plaintiff with a more advanced "combination treatment" for hepatitis C which would have protected plaintiff from liver cirrhosis or cancer); *Johnson v. Standifird*, 400 Fed. App'x 369, 371 (10th Cir. 2010) (no constitutional violation where orthopedist recommended against surgery to treat degenerative disease in plaintiff's knee and hip until the condition "severely affected the quality of his life.").

On the other hand, deliberate indifference may exist where officials prevent an inmate from receiving recommended treatment or deny an inmate access to medical personnel capable of evaluating the inmate for needed treatment.  *Ramos*, 639 F.2d at 575 (citing *Inmates of Allegheny Cnty. Jail v. Pearce*, 612 F.2d 754, 762 (3d Cir. 1979); *Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir. 1977)).  However, "a delay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm. The substantial harm requirement "may be satisfied by

lifelong handicap, permanent loss, or considerable pain.  *Mata*, 427 F.3d at 751 (internal

quotations omitted).

### c. Plaintiff's Claims Against G.E.O.

Plaintiff moved to join G.E.O. as a Defendant, claiming that they "should be held

accountable for their negligence and deliberate indifference toward the plaintiffs [sic]

safety and health."  (Doc. 37 at 1).  He alleges that G.E.O. was negligent by not fulfilling

a duty to provide a safe environment, specifically because there were not ladders on the

bunk beds.  (*Id.* at 2).  Although the Court granted his motion, it expressed concern that

the applicable statute of limitations may bar Plaintiff's claims against G.E.O.  (Doc. 48 at

2).

Under the judicial screening process set up in the Prison Litigation Reform Act of

1995 ("PLRA"), the Court

> shall on its own motion. . .dismiss any action brought with respect to prison
> conditions under § 1983. . . by a prisoner. . . if the court is satisfied that the action
> is frivolous, malicious, fails to state a claim upon which relief can be granted, or
> seeks monetary relief from a defendant who is immune from such relief.

42 U.S.C. § 1997e(c)(1) (1995).

"The statute of limitations period for a § 1983 claim is dictated by the personal injury

statute of limitations in the state in which the claim arose."  *McCarty v. Gilchrist*, 646

F.3d 1281, 1289 (10th Cir. 2011).  The period of limitations on personal injury actions in

New Mexico is three years.  *See* N.M.S.A. 1978 § 37-1-8.  "Section 1983 claims accrue,

for the purpose of the statute of limitations, when the plaintiff knows or has reason to

know of the injury which is the basis of his action."  *See Johnson v. Johnson Cnty.*

*Comm'n Bd.*, 925 F.2d 1299, 1301 (10th Cir. 1991) (internal quotations omitted).

The statute of limitations may be tolled under some circumstances, as allowed for under state tolling rules. *Roberts v. Barreras*, 484 F.3d 1236, 1241 (10th Cir. 2007). In New Mexico, the limitations period applicable to a prisoner's claim may be tolled where circumstances beyond the prisoner's control prevent filing of the claim or while a prisoner attempts to exhaust mandatory administrative remedies. *See Roberts*, 484 F.3d at 1241-42; N.M.S.A. 1978 § 37-1-12. However, "a district court may not *sua sponte* dismiss a prisoner's § 1983 action on the basis of the statute of limitations unless it is clear from the face of the complaint that there are no meritorious tolling issues, or the court has provided the plaintiff notice and an opportunity to be heard on the issue." *Vasquez Arroyo v. Starks*, 589 F.3d 1091, 1097 (10th Cir. 2009).

In this case, Plaintiff was allowed to amend his complaint to add Defendant G.E.O. in spite of the Court's concerns about whether the claim was in fact barred by the statute of limitations. (Doc. 48 at 2). The applicable statute of limitations in New Mexico for this claim bars a cause of action that accrued prior to December 31, 2006, three years before Plaintiff filed his case in state court. Therefore, in order to proceed with a claim against G.E.O. for any claims related to his fall from the bunk bed in 2004, the statute of limitations must be tolled. In his Memorandum Order and Opinion, Judge Browning gave Plaintiff an opportunity to provide the Court "with sufficient evidence to support a tolling argument based on the filing of his grievances." (Doc. 59 at 15).

In Plaintiff's Response to Wexford's *Martinez* Report, he asserts that the statute of limitations should be tolled because he was actively seeking medical treatment, was unable to consult with an attorney regarding his claims, and was not knowledgeable enough about the law to file his own claim. This argument does not provide any

grounds for equitable tolling, as Plaintiff does not demonstrate that any extraordinary circumstances beyond his control prevented him from filing his complaint.  Although Plaintiff was actively seeking medical treatment, the record does not reflect that he made diligent efforts to pursue administrative or legal avenues for relief.  *See Ocana v. American Furniture Co.*, 91 P.3d 58, 66 (N.M. 2004).

The record contains all of Plaintiff's relevant grievances from 2004 through June 2012.  (Doc. 83-14 at 1-4).  Only three of these were filed before December 31, 2006 and two were not fully exhausted.  (Doc. 83-14 at 1-4).  The exact date of Plaintiff's fall from his bed is not known, but if the Court assumes it happened on December 31, 2004, the statute of limitations would run on December 31, 2007.  Even if the Court allowed the statute of limitations to be tolled while Plaintiff exhausted his administrative remedies, the statute would only be tolled by two months, which was the time from when Plaintiff submitted his informal complaint on June 25, 2005, until it was answered on August 26, 2005, by the Department of Corrections.  (Doc. 83-21 at 1-10).

Plaintiff has not made an argument sufficient to allow equitable tolling, nor has he provided any evidence to support a statutory tolling for the time he was exhausting his administrative remedies.  Therefore, the Court recommends that Plaintiff's claim against G.E.O. be dismissed for failure to state a claim upon which relief can be granted.

### d.  Plaintiff's Claims Against Wexford Health Services, Inc.

Plaintiff's Third Amended Complaint alleges that Wexford Health Services, Inc. violated his Eighth Amendment rights by failing to provide him with adequate medical care.  Defendant Wexford's *Martinez* Report asks the Court to grant summary judgment in its favor because Plaintiff has failed to demonstrate that Wexford violated Plaintiff's

constitutional rights and that Plaintiff's claims are statutorily barred as untimely.  (Doc. 85 at 23-30).

During the time period that Wexford was providing medical care for Plaintiff, from 2005 through June 29, 2007, Plaintiff claims that his complaints of a back injury and severe back pain were ignored.  (Doc. 30 at 13-16; Doc. 85 at 23).  In addition to these allegations, Plaintiff asserts that Defendant Wexford denied him the fusion surgery recommended by Dr. Harvie in the summer or fall of 2006.  (Doc. 30 at 14).

However, as outlined above, a prisoner cannot state a constitutional violation by complaining that a "prison physician has been negligent in diagnosing or treating a medical condition." *Estelle, 429* at 106.  Plaintiff cannot show deliberate indifference by arguing that prison doctors were pursuing a course of treatment which the Plaintiff felt was ineffective or even negligent. *See, e.g., Taylor,,* 410 Fed. App'x 76.  Additionally, physicians are free to exercise their medical judgment as to the appropriate treatment for a patient. *See Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006).  However, a plaintiff may be able to show deliberate indifference when prison officials prevented a prisoner from receiving recommended treatment. *See Ramos*, 639 F.2d at 575.

Plaintiff's prison medical records reflect that Plaintiff was seen by a medical provider numerous times for his back pain from April of 2005 through June 2007. (HINZO 00626 – HINZO 1002).  He received an x-ray, CT scan, and an MRI over the course of two years and was prescribed several medications of varying strengths and doses.  (Id.).  Plaintiff had consultations with specialists outside the prison, was instructed about exercises that might alleviate his back pain, and was provided a back brace.  (HINZO 00658, 00581-00604; Doc. 87 at 48-49).  Although these treatments

may not have relieved Plaintiff's back pain or been precisely the treatment he wanted, he regularly received medical treatment in the form of appointments with medical providers, pain medications, diagnostic testing.  Moreover, the record contains some statements from Plaintiff that at times, his pain medications were providing some relief. Although Plaintiff asserts that, at times, diagnostic testing or his receipt of medications were delayed, he cannot show that the delays were because of Defendants' deliberate indifference.  The frequency with which Plaintiff saw medical providers undermines his claims that treatment was regularly delayed.  At most, these delays were the result of negligence on the part of the medical staff or a decision to follow another course of treatment.

Plaintiff claims that fusion surgery was recommended by Dr. Harvie in September 2006, but that Defendant Wexford refused to pay for it.  (Doc. 30 at 15; Doc. 119 at 6-7). If true, this could potentially be the basis for a constitutional claim. However, the record does not support Plaintiff's assertion that Dr. Harvie recommended surgery.  Dr. Harvie's own report does not mention a fusion surgery, though it does recommend an MRI, a follow up appointment, and the possibly that a nerve block may help determine the area causing Plaintiff's pain.  (Doc. 87 at 48-49).  Plaintiff's prison doctor, Dr. Deming, reported that she spoke with Dr. Harvie who had said that if the pain was relieved by a nerve block, there was a 90% chance that surgery would be effective in relieving Plaintiff's pain.  (HINZO 00681).  These recommendations are not a specific recommendation for surgery that Defendants denied.  In rebutting this evidence, Plaintiff points to a report from Dr. Malizzo in which he wrote in a paragraph about the history of Plaintiff's injury that Plaintiff saw "Dr. Harvie who recommended what sounds like a

decompression and fusion surgery for this." (Doc. 118 at 5; HINZO 01770). The most reasonable inference to be made from the only sentence in the record in which it is mentioned that Dr. Harvie recommended surgery is that Plaintiff himself provided his medical history to Dr. Malizzo and summarized his understanding of his consultation with Dr. Harvie.

In light of the overwhelming evidence from his medical records that Plaintiff was receiving ongoing and continuous medical care for his back pain, Plaintiff has failed to demonstrate that Defendant Wexford violated his constitutional rights. The Court recommends that summary judgment be granted in favor of Defendant Wexford.

### e. Plaintiff's Claims Against New Mexico Corrections Department and its Employees

Plaintiff claims that New Mexico Department of Corrections and its Employees Joe Williams, George Tapia, Wayne Gallegos, Jerry Roark, Lawrence Jaramillo, and David Gonzales violated his Eighth Amendment rights by failing to provide a safe environment and adequate medical care. Plaintiff's claims under § 1983 against these Defendants have been dismissed, except as against Defendant David Gonzales. (Doc. 59 at 28). Defendant Gonzales is the Corrections Officer who transported Plaintiff to the LTCU from the hospital in April 2009; Plaintiff alleges that he drove at a high rate of speed and went off the road, acting deliberately indifferent to Plaintiff's safety and re-injuring Plaintiff's back. (Doc. 30 at 17-18). In NMCD's *Martinez* Report, Defendant alleges that Plaintiff has failed to exhaust his administrative remedies as required by the PLRA. (Doc. 83 at 17-21).

Under the PLRA, "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any

jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (1996). Under this provision, "proper exhaustion" is compliance with the prison's grievance procedure, including its deadlines. *Woodford v. Ngo,* 548 U.S. 81, 88 (2006).  An inmate must do more than initiate the administrative grievance process; he must complete it prior to filing suit.  *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002).  Under the PLRA, the exhaustion requirement is mandatory and no longer within the discretion of the district court. *Woodford, 548 U.S.* at 85.  However, the defendants must demonstrate that the plaintiff has not exhausted his administrative remedies.  *Roberts*, 484 F.3d at 1244.

In this case, NMCD's *Martinez* Report included all of the grievances Plaintiff filed that are relevant to his claims.  (Doc. 83, Ex. 14-22).  Although Plaintiff filed five grievances after May 2009, only two discuss Plaintiff's alleged second back injury and connect it with his transportation from the hospital.  (Doc. 83-18; Doc. 83-19).  However, both of these grievances fail to mention Defendant Gonzales or provide any details regarding his allegedly reckless driving.  Therefore, Plaintiff has failed to exhaust his administrative remedies regarding his claim that Defendant Gonzales violated his Eighth Amendment rights by failing to provide safe conditions of confinement.  The Court recommends that the § 1983 claims against Defendant Gonzales be dismissed for failure to exhaust.

### f.  Plaintiff's Claims Against Correctional Medical Services, Inc., Dr. Arnold, Dr. Stover, Dr. Debra Clyde, Dr. Mizell, and Liane Lopez, RN

Plaintiff claims that Defendant CMS and its employees violated his Eighth Amendment rights by failing to provide adequate medical care.  Plaintiff's central

allegations against the CMS Defendants are that they (i) failed to treat Plaintiff's injury by ignoring his complaints, prescribing medication that insufficiently relieved Plaintiff's pain, and delaying recommended surgery; (ii) transported Plaintiff to a prison facility less than two days after his back surgery against medical advice; and (iii) Defendant Lopez intentionally misinformed grievance officers about the quality of Plaintiff's medical care. The CMS Defendants argue that Plaintiff has failed to establish that the CMS Defendants were deliberately indifferent to Plaintiff's medical needs. (Doc. 84 at 112).

### i. Failure to Treat Plaintiff's Injury

Between July 1, 2007, and Plaintiff's surgery on April 28, 2009, CMS attempted to treat Plaintiff's back pain with increasingly invasive treatments, as well as medications of varying strength and doses. Contrary to his assertions that his injury was not treated, Plaintiff received physical therapy, traction, and epidural injections; received an extra mattress in his cell for comfort; had his medications adjusted and replaced numerous times; and had consultations and diagnostic testing with outside medical providers. He was also seen more than once a month by a medical provider within the prison system. As discussed above, Plaintiff has not shown that Dr. Harvie recommended a surgery that Defendants unduly delayed or denied. In fact, Plaintiff told Dr. Malizzo in April 2008, that he wanted to try conservative care before surgery, but that it had now failed. (HINZO 01770). After two consultations with neurosurgeon Dr. Hankinson in the fall of 2008, Plaintiff decided on December 9, 2008 that he was "ready" for surgery. (HINZO 01207). He met with Dr. Hankinson within three weeks and had surgery five months later, in April 2009.

The record does not support any contention that a second surgery has been specifically recommended for Plaintiff.  In April 2011, Dr. Hankinson reviewed a 2011 MRI and reported that an operation was available, but did not recommend one, listing other options as well.  (HINZO 01781).  Treatment alternatives such as pain medications, epidural injections, and a referral to a chronic pain clinic have been suggested and pursued.  (HINZO 01705-01781).  There are also several examples in the record of statements by Plaintiff that indicate that certain medications are working, as detailed in the Factual Background above.

Plaintiff also specifically alleges that Defendant Clyde maliciously withdrew his pain medication.  (Doc. 30 at 20-21; HINZO 01542-01563).  However, she replaced his prescription for MS Contin with a prescription for another, less addictive narcotic, methadone.  (HINZO 01516).  Plaintiff's disagreement over his prescribed treatment does not rise to the level of a constitutional violation.  *See Perkins*, 165 F.3d at 811.

This level of escalating treatment, along with consistent interaction with medical providers does not support a claim that the CMS defendants violated Plaintiff's constitutional rights by failing to provide adequate medical care.  Plaintiff acknowledges that he was receiving medications and concedes that he had various appointments and consultations, but incorrectly assumes that this does not constitute "treatment" of his injury.  (Doc. 118 at 3-5; Doc. 119 at 2).  Even where the CMS Defendants have failed to alleviate Plaintiff's pain or where delay in the administration of his medication may have caused Plaintiff additional pain, he has not met the subjective prong of the test for an Eighth Amendment violation. The frequency of Plaintiff's care does not support a

finding that Defendants have disregarded a risk of substantial harm.  *See Martinez*, 563 F.3d at 1089.

### ii.  Early Discharge from Hospital

Plaintiff alleges that the CMS Defendants transported him to the LTCU both earlier than a floor doctor recommended and in a manner that caused him a second back injury.  Defendants contend that Dr. Hankinson discharged Plaintiff and therefore, they were not deliberately indifferent to his medical or safety needs. (Doc. 84 at 112).

The record shows that Dr. Hankinson, Plaintiff's surgeon, discharged him on the date that he was transported to the LTCU and the discharge papers specifically note that Plaintiff is being transported in a van.  (HINZO 01794-01795).  Plaintiff asserts that an unnamed floor doctor called the CMS Defendants and recommended that Plaintiff should be transported in an ambulance or lying down.  (Doc. 30 at 17).   However, this recommendation from this unidentified physician is not reflected anywhere in the record. The record does, however, support the reasonable inference that Plaintiff's treating physician, Dr. Hankinson, was informed of Plaintiff's transportation arrangements and approved them.  Under the standards for summary judgment, Plaintiff must provide specific facts, not conclusory allegations, to demonstrate that there is a genuine issue for trial.  He does not allege that Dr. Hankinson also recommended a specific mode of transportation, or that Defendants knew that transporting Plaintiff sitting up in a van was likely to lead to substantial harm and disregarded that risk.  Plaintiff has failed to demonstrate that the CMS Defendants were deliberately indifferent to his medical needs or safety.

### iii.   Claims Against Defendant Lopez

In his Third Amended Complaint, Plaintiff alleges that Defendant Lopez intentionally misinformed the grievance officer about the quality of Plaintiff's medical care.  (Doc. 30 at 20).  He states that in response to an inquiry from the grievance officer about Plaintiff's medical care, Defendant Lopez knew that "all she had to say was that 'the Plaintiff is being treated properly for his condition' and not Mr. Roark or Mr. Gallegos would 2nd guess her or Dr. Clyde's decision."  (Doc. 30 at 20).  Defendant Lopez asserts that her statements were "true and correct" and therefore, do not provide a basis for any claim against her.

Defendant Lopez did write that Plaintiff was "receiving treatment deemed to be appropriate for his medical condition."  (Doc. 83-18 at 3).  However, in his appeal of the grievance, Plaintiff wrote that Defendant Lopez had never spoken with him and wrote her response to his grievance based on reading "papers," presumably his medical records.  (Doc. 83-18 at 8).  The Tenth Circuit has recognized that "a denial of a grievance, by itself without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation under § 1983."  *Gallagher v. Shelton*, 587 F. 3d 1063, 1069 (10th Cir. 2009).  Although Plaintiff's Third Amended Complaint alleged plausible allegations that Defendant Lopez was aware that Plaintiff was not receiving adequate medical treatment, the record does not support the inference that she had any such knowledge.  As he admits in his own grievance, Defendant Lopez was not personally involved in his medical care.  She based her memorandum on her reading of his voluminous medical records, which the Court has determined do not support a claim that Plaintiff was denied adequate medical care.

Because Plaintiff has failed to demonstrate that the CMS Defendants were deliberately indifferent in providing his medical care, the Court recommends that summary judgment be granted in favor of the CMS Defendants.

### g.  Plaintiff's N.M.T.C.A. and Common Law Negligence Claims

Because the Court recommends that all of Plaintiff's federal law claims should be dismissed, the Court declines to exercise supplemental jurisdiction over Plaintiff's state claims.  See United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966) ("It has consistently been recognized that pendant jurisdiction is a doctrine of discretion, not of plaintiff's right. . . Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well")

### h.  Plaintiff's Motion for Summary Judgment

Plaintiff moved the Court to grant him summary judgment or a default judgment against Defendants represented by Counsel Norman Weiss; as grounds, Plaintiff asserted that Defendants had failed to serve him with their *Martinez* Report.  As detailed in the Procedural Background above, Plaintiff received CMS's *Martinez* Report before the Court received his Motion for Summary Judgment.  The Court recommends that Plaintiff's Motion for Summary Judgment be denied as moot.

### IV.    Conclusion

For the reasons stated above, the Court recommends that:

a)  Summary Judgment be **GRANTED** in favor of Defendant New Mexico Corrections Department and its Employees;
b)  Summary Judgment be **GRANTED** in favor of Defendants Correctional Medical Services, Inc., Dr. Arnold, Dr. Stover, Dr. Debra Clyde, Dr. Mizell, and Liane Lopez, RN;

c) Summary Judgment be **GRANTED** in favor of Defendant Wexford Health Services, Inc., and its Employees;

d) Plaintiff's claims against Defendant G.E.O. be **DISMISSED WITH PREJUDICE**;

e) Plaintiff's claims under the N.M.T.C.A. be **DISMISSED WITHOUT PREJUDICE**;

f) Plaintiff's Motion for Summary Judgment be **DENIED AS MOOT**.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

_____
THE HONORABLE CARMEN E. GARZA
UNITED STATES MAGISTRATE JUDGE